Robin and Stephen ST. JEAN, Kathleen
and Gregg Bullock, and Bruce
Goulette, Plaintiffs,

v.

RACAL MORTGAGE, Chemical Residential Mortgage Corporation, and GE Capital Mortgage Services, Inc., Defendants.

Civil No. 95–416–P–C.

United States District Court,
D. Maine.

Jan. 22, 1997.

Kurt E. Olafsen, Portland, ME, for Plaintiffs St. Jean and Bullock.

John G. Connor, Portland, ME, for Plaintiff Goulette.

Richard L. O'Meara, Charles P. Piacentini Jr., Murray Plumb & Murray, Portland, ME, for Defendants.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

The Court now has before it four motions for summary judgment: Defendants' Motion for Summary Judgment against Kathleen and Gregg Bullock (Docket No. 3); Plaintiffs Kathleen and Gregg Bullock, and Robin and Stephen St. Jean's Motion for Partial Summary Judgment on Defendants' fifth affirmative defense (Docket No. 9); Defendants' Motion for Partial Summary Judgment (Docket No. 19); Plaintiffs' Motion for Partial Summary Judgment on Defendants' Remaining Affirmative Defenses (Docket Nos. 29 and 30). The parties contest a number of facts in the record. After reviewing the depositions, deposition exhibits, affidavits, and pleadings on file, the Court concludes that none of the parties' factual disputes is material to the resolution of this case. The Court will deal with each motion in turn.

## I. FACTS

The Maine Bureau of Consumer Credit Protection is responsible for administering and enforcing the provisions of the Maine Consumer Credit Code. 9–A M.R.S.A. § 1–101 *et seq.* In 1991, Racal Mortgage, Inc. ("Racal") registered with the Maine Bureau of Consumer Credit Protection as a Credit Services Organization ("CSO"). M. Kilbreth Dep. at 28. Racal's registration to do business as a CSO in Maine was renewed each year through 1994. M. Kilbreth Dep. at 20.

In October 1991, Racal was notified by the Maine Bureau of Consumer Credit Protection that an advertisement it had placed in the *Portland Press Herald* noting that it was an "Equal Housing Lender" appeared to indicate "that [it] was a lender rather than an arranger [of credit] for these loans." M. Kilbreth Dep. at 86; Dep. Ex. 11. Racal responded to this notice in a letter dated October 28, 1991, and acknowledged that it "must eliminate the 'Equal Housing Lender' logo and, in lieu of this, add a line saying 'Racal Mortgage is a Maine licensed Credit Services Organization.'" M. Kilbreth Dep. Ex. 10.

In November 1991, Racal underwent its first examination in Maine by Connie Berthiaume, an examiner from the Bureau of Consumer Credit Protection. Berthiaume Dep. at 25. At the conclusion of the examination, no violations of the Consumer Credit Code were found. On January 10, 1992, the Bureau of Consumer Credit Protection sent a

letter to Racal pointing out that it is not a licensed lender and, therefore, that it was inappropriate for Racal to list itself with other licensed lenders or supervised financial organizations under the "Local Mortgage Rates" column in the local paper. M. Kilbreth Dep. at 50; Dep. Ex. 3. Racal responded to this inquiry with its own letter of January 23, 1992, in which, among other things, it agreed to discontinue its listing of rates under the Local Mortgage Rates column. M. Kilbreth Dep. at 82–84; Dep. Ex. 8.

On April 30, 1992, Plaintiffs Gregg and Kathleen Bullock executed and delivered to Racal a promissory note and a mortgage deed on their residence in Auburn, Maine.[1] The Bullock loan transaction, with Racal as the "lender," was the first such transaction ever entered into by Racal in Maine. Laurier V. Kilbreth Dec. ¶ 6. On July 30, 1992, Plaintiff Bruce Goulette executed and delivered to Racal a promissory note and a mortgage deed on his residence in Turner, Maine. Goulette Aff. ¶¶ 2–3. On September 21, 1992, Plaintiffs Robin and Stephen St. Jean executed and delivered to Racal a promissory note and a mortgage deed on their residence in Auburn, Maine.[2] All of these loans were for the purpose of financing or refinancing Plaintiffs' residences.

At the time the loans to Plaintiffs closed, Racal was registered as a CSO in Maine. L. Kilbreth Dec. ¶ 4; M. Kilbreth Dep. at 28.

During the same time frame, Racal also held various mortgage lender and/or loan broker licenses in the state of New Hampshire and Commonwealth of Massachusetts.[3] M. Kilbreth Dep. at 96–101; Dep. Ex. 16–21. The loans from Racal to Plaintiffs were "table funded;" that is, Chemical Residential Mortgage Corporation ("Chemical") provided all of the funds to be loaned to Plaintiffs and the loans were, immediately after closing, assigned to Chemical. M. Kilbreth Dep. at 50; L. Kilbreth Dec. ¶ 5; Cassell Dep. at 25–26. It is not disputed that after the closing, Chemical undertook the obligation to service the loans and to collect any amounts due from the borrowers.[4] Racal had never engaged in this type of transaction during 1991 or anytime prior to 1991. Kilbreth Dec. ¶ 6. Racal had previously arranged table-funded loans in which it closed loans not in its own name but in the name of a investor, such as Chemical. M. Kilbreth Dep. 51.

## II. DISCUSSION

The Court of Appeals for the First Circuit has recently explained once again the workings and purposes of the summary judgment procedure:

> Summary judgment has a special niche in civil litigation. Its "role is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794

---

**1.** The mortgage deed was recorded in the Androscoggin County Registry of Deeds in Book 2841, Page 191, and assigned to Chemical pursuant to assignments recorded in Book 2841, Page 204, and Book 3444, Page 168. This mortgage deed was further assigned by Chemical to GE Capital pursuant to an assignment recorded in Book 3444, Page 169. Complaint ¶ 10.

**2.** The mortgage deed was recorded in the Androscoggin County Registry of Deeds in Book 2920, Page 328, and assigned to Chemical pursuant to an assignment recorded in Book 2923, Page 133. Complaint ¶ 9.

**3.** In 1991 and in subsequent years, Racal obtained the following licenses from the State of New Hampshire: the First Mortgage Banker license; Broker license; and Second Mortgage Banker license. M. Kilbreth Dep. at 96–98; Dep. Exs. 16, 17. As of no later than January 1992, Racal had also obtained a license as a

mortgage broker for the Commonwealth of Massachusetts. M. Kilbreth Dep. 98; Dep. Exs. 18–20. In Racal's Application of Foreign Corporation for Authority to do Business in the State of Maine, Racal indicated that it is authorized both to engage in lending of money and to solicit mortgage loans in New Hampshire. M. Kilbreth Dep. at 92; Dep. Ex. 13. In its "First Mortgage Banker/Broker Annual Report" filed in New Hampshire for the period ending December 31, 1993, Racal reported that of the 35 New Hampshire loans, all were first mortgage loans "made" by Racal—and vice versa, that none were "brokered" by Racal. M. Kilbreth Dep. at 105; Dep. Ex. 25.

**4.** The record indicates that at least Goulette was aware that the loan from Racal was being sold immediately to Chemical. In that regard, Goulette received a "Loan Sale Notice" at the loan closing indicating that Racal was selling the loan to Chemical. Goulette Aff. ¶ 4.

(1st Cir.1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). The device allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money, and permitting courts to husband scarce judicial resources.

A court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) . . . .

Once a properly documented motion has engaged the gears of Rule 56, the party to whom the motion is directed can shut down the machinery only by showing that a trial-worthy issue exists. *See National Amusements [v. Town of Dedham]*, 43 F.3d [731,] 735 [ (1st Cir.1995) ]. As to issues on which the summary judgment target bears the ultimate burden of proof, she cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute. *See Garside [v. Osco Drug, Inc.]*, 895 F.2d [46,] 48 [ (1st Cir. 1990) ]. Not every factual dispute is sufficient to thwart summary judgment; the contested fact must be "material" and the dispute over it must be "genuine." In this regard, "material" means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. *See [United States v.] One Parcel [of Real Property with Buildings]*, 960 F.2d [200,] 204 [ (1st Cir.1992) ]. By like token, "genuine" means that "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party . . . ." *Id.*

When all is said and done, the trial court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor," *Griggs–Ryan [v. Smith]*, 904 F.2d [112,] 115 [ (1st Cir.1990) ], but paying no heed to "conclusory allegations, improbable inferences, [or] unsupported speculation," *Medina–* *Munoz [v. R.J. Reynolds Tobacco Co.]*, 896 F.2d [5,] 8 [ (1st Cir.1990) ]. If no genuine issue of material fact emerges, then the motion for summary judgment may be granted.

. . . [T]he summary judgment standard requires the trial court to make an essentially legal determination rather than to engage in differential factfinding . . . .

*McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 314–15 (1st Cir.1995).

### A. Claims of Kathleen and Gregg Bullock

■ The Court will first address Defendants' Motion for Summary Judgment against Kathleen and Gregg Bullock (Docket No. 3). Defendants move for summary judgment against the Bullocks, arguing that Racal was not a "creditor" within the meaning of Article 9 of the Maine Consumer Credit Code when it lent money to the Bullocks and, thus, that it was not subject to the licensure requirements of the Code. The Bullocks disagree, arguing that because Racal lent money more than five times during the 1992 calendar year, it is subject to the Code's licensure standards.

The Bullock loan was the first ever made by Racal as a lender in Maine. Although Racal was licensed as a CSO at the time of the loan (and not as a supervised lender), it did not violate the Maine Consumer Credit Code in the course of the Bullock loan transaction. Section 9–101 establishes the scope of transactions governed by the requirements of Article 9. That section specifically provides that Article 9 "applies to all consumer credit transactions made *by creditors* that are not supervised financial organizations, that are secured by a first lien mortgage on real estate." 9–A M.R.S.A. § 9–101 (emphasis added). The requirements of Article 9, therefore, apply only to "creditors," as that term is defined by the Code. Racal relies on the Code, which defines "creditor," in part, as one who "regularly extends credit in the consumer credit transactions." 9–A M.R.S.A. § 1–301(17)(A). That section goes on to specify that:

[a] person regularly extends credit only if that person extended credit more than 25

times, or more than five times for transactions secured by a dwelling, in the preceding calendar year. If a person did not meet these numerical standards in the preceding calendar year, the numerical standard must be applied to the current calendar year.

9–A M.R.S.A. § 1–301(17).

■ Racal made no mortgage loans in Maine during 1991 or in any prior year. The loan made to the Bullocks was Racal's first loan in Maine. The Code requires a minimum of five mortgage loans before a lender may be deemed a "creditor" under the Code. As of April 30, 1992, the date of the Bullock loan, Racal had never extended credit for a home mortgage in Maine and, thus, was not a "creditor" as defined by the Code.

The Bullocks respond that Racal was subject to the licensure requirements of the Consumer Credit Code because it lent money more than five times during the 1992 calendar year. The Bullocks argue that if an entity is in the business of consumer lending and anticipates that it may make more than five loans in a calandar year, it must obtain a license before making the first such loan. Objection and Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment Against Plaintiffs Kathleen and Gregg Bullock (Docket No. 25) at 5. In other words, the Bullocks contend that Racal's later loan transactions should be counted retroactively. The Court disagrees.

■ The statute is unambiguous. It is not necessary for the unlicensed lender to determine in advance whether it will qualify as a creditor during a particular year. If a lender makes consumer loans secured by real estate, it must stop lending after the fifth loan of the calendar year if it does not have a license to make supervised loans. Otherwise, it will be deemed to be regularly engaged in the extension of consumer credit. At the time Racal lent money to the Bullocks, it had

not been regularly engaged in the extension of consumer credit and, therefore, was not a creditor to which Article 9 is applicable. The prohibition against unlicensed lending in 9–A M.R.S.A. § 9–201 does not apply to the Racal–Bullock transaction because Racal was not a creditor at the time the loan was made to the Bullocks.[5] Thus, the Court concludes that there has been no violation of the Code in the course of the Bullock loan transaction, and the Court will grant summary judgment for Defendants on the Bullocks' claim. See Defendants' Motion for Summary Judgment against Kathleen and Gregg Bullock (Docket No. 3).

### B. Defendants' Affirmative Defenses

Plaintiffs move for summary judgment on the Defendants' affirmative defenses: (1) Plaintiffs fail to state a claim under the Maine Consumer Credit Code; (2) 9–A M.R.S.A. § 1–202(8) of the Maine Consumer Credit Code exempts Defendants from liability for transactions involving purchase money and refinance loans secured by a first lien on real estate; (3) and (4) any violation of the Maine Consumer Credit Code either resulted from an unintentional or *bona fide* error, notwithstanding the maintenance of procedures reasonably adapted to avoid any such violation; and (5) 9–A M.R.S.A. § 9–405 (Supp.1994) applies retroactively.

#### 1. *Failure to state a claim under the Maine Consumer Credit Code*

■ The undisputed facts establish that Racal violated the statutory prohibition against making supervised loans without first obtaining a "supervised lender" license.[6] The Maine Consumer Credit Code distinguishes between those organizations which actually extend credit to Maine consumers— a "supervised lender"—and those which simply arrange for the extention of credit to consumers—a CSO. Arrangers of credit to

---

5. Article 9 of the Code governs mortgage lending. Section 9–201, entitled "Authority to make supervised loans; licensing," incorporates by reference the requirements of § 2–301 of the Code, a general provision concerning the licensure for supervised lending in Maine.

6. 9–A M.R.S.A. § 1–301(39) defines a "supervised lender" as:

a person authorized to make or take assignments of supervised loans, either under a license issued by the Administrator (section 2–301), or as a supervised financial organization (Section 1–301, subsection 38).

be extended by another are not required to obtain a supervised lender license. However, a supervised lender license is necessary for businesses, other than supervised financial organizations, which engage in the business of making supervised loans. *See* 9–A M.R.S.A. § 2–301(1).[7]

At the time the loans at issue in this case were made, Racal, as a Maine registered CSO, was authorized to perform the following services:

    1. Improving a consumer's credit record, history or rating;

    2. Arranging for or obtaining an extension of credit for a consumer; or

    3. Providing advice or assistance to a consumer with respect to subparagraph 1 or 2.

9–A M.R.S.A. § 10–102(1). Plaintiffs argue that Racal's participation in table-funded loans went beyond the services Racal was entitled to provide as a registered CSO. Specifically, Plaintiffs argue that Racal *made* the supervised loans to them. Defendants agree that the loans to Plaintiffs were supervised loans as defined by the Code, 9–A M.R.S.A. § 1–301(40)[8], but contend that it was Chemical, not Racal, which made the loans. Along the same line, Defendants contend that Racal never "extended credit" in any of Plaintiffs' loan transactions. Racal, Defendants suggest, merely participated as a CSO by arranging for the extension of credit by investors to Plaintiffs.

Plaintiffs' loans were "table-funded" by Chemical; that is, Chemical provided all of the funds to be lent to Plaintiffs. M. Kilbreth Dec. ¶ 7; M. Kilbreth Dep. 79, 104; Cassell Dep. 25–26. The notes and mortgages given initially to Racal by Plaintiffs were, Defendants assert, simultaneously assigned to Chemical. M. Kilbreth Dec. ¶ 7; M. Kilbreth Dep. 79. In addition to being the investor, Chemical initially undertook the re-

sponsibility for servicing the loans and collecting payments from borrowers. The Court finds these arguments unpersuasive.

As stated above, Article 9 applies to Racal only if it was a "creditor" at the time Plaintiffs' loans were made. Defendants contend that the mere fact that the loan documentation named Racal as the "lender" does not establish that Racal was a "creditor" under the Code. A creditor is defined in the Code as:

    a person who both:

    a. Regularly extends credit in consumer credit transactions; and

    b. Is the person to whom the debt arising from the consumer credit transactions is initially payable on the face of the evidence of indebtedness....

9–A M.R.S.A. § 1–301(17). As previously discussed, *supra* section II.A., the Code defines "regularly extends credit" to mean, under these circumstances, more than five times in the current or preceding calender year. 9–A M.R.S.A. § 1–301(17). Racal made more than five loans secured by real estate in 1992 and, therefore, it was regularly extending credit at the time of the Goulette loan transaction. The only question remaining is who was "the person to whom the debt arising from the consumer credit transactions [was] initially payable on the face of the evidence of indebtedness." 9–A M.R.S.A. § 1–301(17).

Defendants assert that since the initial transaction simultaneously assigned the indebtedness to Chemical at the closing table, Chemical, not Racal, was the entity to whom the evidence of indebtedness was initially payable. The indebtedness was not simultaneously assigned to Chemical, it was *subsequently* assigned to Chemical. Moreover, Defendants' argument ignores an operative portion of the statute which clearly impli-

---

7. 9–A M.R.S.A. § 2–301 provides, in part:
    Unless a person is a supervised financial organization or has first obtained a license pursuant to this Act from the administrator authorizing him to make supervised loans, he shall not engage in the business of:
      1. Making supervised loans;

    .    .    .    .    .

8. 9–A M.R.S.A. § 1–301(40) provides:

"Supervised loan" means a consumer loan, including a loan made pursuant to open end credit, in which the rate of the finance charge, calculated according to the actuarial method, exceeds 12¼%% per year, or which is secured by an interest in real estate.

cates Racal to the exclusion of Chemical; that is, Racal was the person to whom the debt was initially payable *"on the face of the evidence of indebtedness."* *See* Stipulation (Docket No. 42) Exs. A and B, promissory note and mortgage executed by Stephen and Robin St. Jean; Exs. C and D, promissory note and mortgage executed by Kathleen and Gregg Bullock; Affidavit of Bruce Goulette, Exs. A–D. Accordingly, Racal fits the definition of creditor under the Code.

Defendants rely on the same argument, regarding simultaneous assignment, in their attempt to establish that Chemical *made* the loans. As discussed above, the Court does not agree that Racal simultaneously assigned the loans to Chemical. In addition, the fact that Chemical was the entity initially responsible for servicing the loans is not inconsistent with the finding that Racal made the loans. The Court finds that at the time the loans were made to Plaintiffs, Racal was a creditor and it exceeded its authority as a CSO by making consumer loans permitted by only a supervised lender. Consequently, Racal and its assignees are subject to the penalties described in § 9–405(4).[9]

■ Defendants, nevertheless, can avoid liability under § 9–405(4) by proving the *bona fide* defense available in § 9–405(7). The Maine Consumer Credit Code is clear that Racal, as the creditor, is the only Defendant to which this defense is available.

In 1992, at the time of Racal's violations, the Maine Consumer Credit Code provided as follows:

If the creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any

such violation or error, no liability is imposed . . . .

9–A M.R.S.A. § 9–405(7). Defendants contend that if they did violate the code, it was "unintentional" or the "result of a bona fide" error. Plaintiffs argue that they are entitled to summary judgment because this statutory defense does not apply where, as here, Defendants have misunderstood the law. The Court agrees with Plaintiffs.

■ The parties argue about whether the "unintentional" or "bona fide" error in the statute refers to the lack of intent to commit the act itself or the lack of intent to commit a violation of the Code. The Court understands the statute's emphasis to be on the violation itself and not the error. Racal's *violation* was making the loans without a supervised lender license. Intent in this case, where the issue is proper licensure, is irrelevant. A misunderstanding of the law is not excusable under the Code.[10] Therefore, assuming Racal made a good-faith mistake as to Maine's licensure requirements, such a mistake cannot constitute a defense. The Court will grant Plaintiffs' motion for summary judgment on Defendants' first affirmative defense. *See* Motion for Partial Summary Judgment (Docket No. 29 and 30).

### 2. *Maine Consumer Credit Code § 1–202(8)*

In their second affirmative defense, Defendants argue that § 1–202 of the Code excludes from coverage certain kinds of credit. *See* 9–A M.R.S.A. § 1–202. Section 1–202(8), specifically, excludes from the Code loan transactions involving purchase money and refinance loans secured by a first lien on real estate. However, there is an exception within the exclusion. Section 1–202(8)(C) of the Code excludes from the protection of § 1–202(8) violations of Article 9 of the Code—the

---

**9.** 9–A M.R.S.A. § 9–405(4) (Supp.1992) provides:

If a creditor has violated the provisions of this article applying to authority to make supervised loans, section 9–201, the debtor is not obligated to pay the loan finance charge. If he has paid any part of the loan finance charge, he has the right to recover the payment from the person violating this article or from an assignee of that person's rights who undertakes direct collection of payments or enforcement of rights arising from the debt. No ac-

tion pursuant to this subsection may be brought more than one year after the due date of the last scheduled payment of the agreement pursuant to which the charge was paid.

The Court discusses the applicability of this version of the statute *infra* II.B.4.

**10.** The Court notes Racal's apparent familiarity with consumer lending statutes in New Hampshire and Massachusetts. *See* Kilbreth Dep. Ex. 16–21; M. Kilbreth Dep. at 49.

type of violation at issue here.[11] Defendants do not dispute the inapplicability of § 1–202(8) here; rather, they explain that this defense was raised in response to Plaintiff Goulette's initial Complaint which failed to identify the specific provisions of the Maine Consumer Credit Code that allegedly gave rise to his cause of action. Defendants' Objection to Plaintiffs' Motion for Partial Summary Judgment with incorporated statement of Material Facts and Incorporated Memorandum of Law (Docket No. 38) at 14, n. 6. Since there is now no dispute about § 1–202(8)'s application to this case, the Court will grant Plaintiffs' motion for summary judgment on Defendants' second affirmative defense. *See* Motion for Partial Summary Judgment (Docket No. 29 and 30).

### 3. Unintentional or bona fide error defense

With respect to Defendants' third and fourth affirmative defenses, there are no genuine issues of material fact regarding Defendants' claim to the unintentional or *bona fide* error defense available under § 9–405(7). *See* supra II.B.1. The Court will, therefore, grant Plaintiffs' motion for summary judgment on Defendants' third and fourth affirmative defenses. *See* Motion for Partial Summary Judgment (Docket No. 29 and 30).

### 4. Retroactive Application 9–A M.R.S.A. § 9–405(4)

In their fifth affirmative defense, Defendants seek to limit Plaintiffs' recovery to the penalties set forth in the 1994 amendment to § 9–405(4) of the Maine Uniform Consumer Credit Code. Plaintiffs contend that because the mortgage loans to them took place in 1992, before the statutory change, the penalties contained in the former § 9–405 apply to this case. Plaintiffs commenced this action in November 1995, after the effective date of the amendment to § 9–405. Defendants argue that Plaintiffs' remedies are limited to the penalties set forth in the 1994 amendment to the Code because their Complaint was filed after the effective date of the amendment.

At the time the loans were extended to Plaintiffs, § 9–405(4) provided that if a creditor violates the licensing requirements of the Code, the debtor is not obligated to pay the loan finance charges and is entitled to recover such charges paid either to the creditor or its assignee. 9–A M.R.S.A. § 9–405(4) (Supp.1992).[12] In 1994, this section of the Code was amended to limit the penalties assessed against the creditor to recovery of the application fee, prepaid finance charges or closing costs, and the finance charges for the first twelve months of the loan.[13]

Plaintiffs contend that under both the Maine general savings statute, 1 M.R.S.A. § 302, and Maine common law, the 1994 amendment to § 9–405(4) cannot be applied retroactively to their Complaint. Defendants

---

11. 9–A M.R.S.A. § 1–202(8) provides, in part:

A loan or credit sale made by a creditor to finance or refinance the acquisition of real estate or the initial construction of a dwelling, or a loan made by a creditor secured by a first mortgage on real estate, if the security interest in real estate is not made for the purpose of circumventing or evading this Act, provided that:
A. . . .
B. . . .
C. With respect to a creditor other than a supervised financial organization, the exemption provided by this subsection shall apply to articles II, III, IV and V only.
9–A M.R.S.A. § 1–202(8) (footnotes omitted).

12. In 1992, § 9–405(7) also provided that the creditor could avoid liability to the borrower altogether by showing that the "violation [was] unintentional or the result of a bona fide error,

notwithstanding the maintenance of procedures reasonably adapted to avoid any such violation or error." *See supra* II.B.1.

13. 9–A M.R.S.A. § 9–405(4) (Supp.1994) provides:

If a creditor has violated the provisions of this article applying to authority to make supervised loans, section 9–201, the debtor is not obligated to pay any application fee, prepaid finance charge or closing cost, nor the loan finance charge owed for the first 12 months of the loan. If the debtor has paid any part of the application fee, prepaid finance charge, closing cost or loan finance charge owed for the first 12 months of the loan, the debtor has a right to recover the payment from the person violating this article or from an assignee of that person's rights who undertakes direct collection of payments or enforcement of rights arising from the debt.

disagree, arguing that neither the general savings statute nor the common law require the Court to apply the 1992 version of the statute.

Maine's general savings statute, which governs the applicability of statutory changes, provides that "[a]ctions and proceedings pending at the time of the passage, amendment or repeal of an Act or ordinance are not affected thereby." 1 M.R.S.A. § 302. Plaintiffs' civil actions were not pending at the time the Code was amended in 1994. At most, at the time of the Code's 1994 amendment, Plaintiffs had a cause of action which they had yet to pursue in court. This is insufficient to trigger the applicability of § 302's "actions and proceedings pending" clause. Plaintiffs argue, however, that § 302 applies here not because their actions were pending at the time of the amendment, but because the former version of § 9–405(4) caused a "penalty" or "forfeiture" to be incurred by Defendants prior to the amendment of the Code and, therefore, that the old statutory provision survives.[14]

This case is similar to *Beneficial Finance Co. v. State of Maine, Bureau of Banks and Banking*, 393 A.2d 171 (Me.1978). In *Beneficial Finance*, the State Bureau of Banks and Banking conducted an investigation and determined that a lender had violated the Maine Small Loan Agency Act by charging excess interest on various loans. The Maine Small Loan Agency Act was repealed on January 1, 1975, eliminating the supervision of small loan agencies from the Bureau of Banks and Banking. Although the conduct leading to the finding of violation occurred prior to January 1, 1975, the Bureau's order issued after that date. The Maine Law Court found that the Bureau of Banks and Banking lacked authority to issue the order of violation after the statute's repeal. Significantly, the Court rejected the argument made by Plaintiffs here, expressly holding that the Bureau's Order "cannot be considered as enforcing either a 'punishment, penalty or forfeiture incurred before the repeal

[of the Small Loan Agency Act] [took] effect.'" *Id.* at 173.

Here, as in *Beneficial Finance*, there is no merit to Plaintiffs' argument that the action they now have filed seeks merely to enforce a penalty which already was incurred before the repeal and replacement of § 9–405(4). Unlike *Town of Ogunquit v. McGarva*, 570 A.2d 320, 321 (Me.1990), upon which Plaintiffs rely, where the statute provided for a $200–per–day automatic fine for zoning ordinance violations, the previous version of § 9–405(4) did not establish a penalty which was incurred automatically upon a statutory violation. Accordingly, no penalty or forfeiture could have been incurred under the prior version of § 9–405(4). The Court thus concludes that § 302 is inapplicable to this case.

■■■ Given the inapplicability of § 302, the Court must look to the common law to determine whether the prior version of § 9–405(4) should apply to this case. Generally, courts disfavor the retroactive application of statutes. Hence, courts will construe statutes to operate prospectively unless there exists a clear indication from the legislative body that it intended retroactive application. In this case, there is no statement by the Maine Legislature which is of assistance to the Court in making this determination. There is, however, a judicially-created exception to the general rule against retroactivity: permitting the retroactive application if the statute is found to be procedural or remedial, as opposed to substantive, in nature. *See Riley v. Bath Iron Works*, 639 A.2d 626, 628 (Me.1994); *Michaud v. Northern Maine Medical Center*, 436 A.2d 398, 400 (Me.1981). Plaintiffs contend that this statute is substantive, while Defendants argue that the amendment effects a remedial aspect of the Code.

Plaintiffs rely on two Maine cases which state that damages are a substantive element of the claim. *See Howe v. Natale*, 451 A.2d 1198, 1201 (Me.1982); *Batchelder v. Tweedie*, 294 A.2d 443 (Me.1972). *Batchelder*, the earlier of the two cases, relies on *Katz v. Gordon Johnson Co.*, 160 F.Supp. 126 (D.Me. 1958), for the proposition that interest, if

---

14. Section 302 further provides that "the repeal or amendment of an Act or ordinance does not affect any punishment, penalty or forfeiture incurred before the repeal or amendment takes effect." 1 M.R.S.A. § 302.

allowed as a measure of damages, is substantive. *Batchelder*, 294 A.2d at 444. In *Katz* the district court, noting no Maine case law on the particular question, stated that "the rules for ascertaining the measure of damages and the elements thereof, whether the action be tort or contract, pertain to the substance of the right, not to the remedy." *Katz*, 160 F.Supp. at 130. Relying on *Katz*, the Law Court in *Batchelder* seems to have broadened its application of what is substantive from only the rules or elements of damages to also include the measure of damages.

This broadened interpretation was subsequently applied in *Howe v. Natale*, 451 A.2d 1198, 1201 (Me.1982), where the Law Court discussed an amended statutory damages provision. In *Howe*, the appellants challenged, among other things, a referee's award of damages against them under 14 M.R.S.A. § 7552. At the time the action was brought, § 7552 provided for only double damages for a willful violation. The statute was amended prior to trial to allow treble damages for a willful violation. The court found that the treble damages provision did not apply retroactively, stating that the "law of damages is a matter of substance which is fixed when the cause of action accrues." *Howe*, 451 A.2d at 1201.

 This Court is aware, as Defendants point out, that other courts may analyze this issue differently. Nevertheless, Maine law controls the issue herein, and Maine law clearly provides that the measure of damages is a substantive aspect of the case. Because of this clear directive in Maine case law, the amended statute will not be applied retroactively in this case, and the Court will grant Plaintiffs' Motion for Summary Judgment on Defendants' Fifth Affirmative Defense (Docket No. 9) and deny Defendants' Motions for Partial Summary Judgment on its fifth affirmative defense (Docket Nos. 15 and 19).

### III. CONCLUSION

Accordingly, it is *ORDERED* that Defendants' Motion for Summary Judgment against Kathleen and Gregg Bullock (Docket No. 3); Plaintiffs Kathleen and Gregg Bullock, and Robin and Stephen St. Jean's Mo-tion for Partial Summary Judgment on Defendants' fifth affirmative defense (Docket No. 9); Plaintiffs' Motion for Partial Summary Judgment on Defendants' Remaining Affirmative Defenses (Docket Nos. 29 and 30) be, and they are hereby, *GRANTED*. It is further *ORDERED* that Defendants' Motion for Partial Summary Judgment (Docket No. 19) be, and it is hereby, *DENIED*.

This case shall continue to be developed for further proceedings in accordance with the previously entered Scheduling Order (Docket No. 13).