**Margo REAGAN, et al., Plaintiffs, Appellees,**

v.

**RACAL MORTGAGE, INC., et al., Defendants, Appellants.**

**No. 97–1676.**

United States Court of Appeals, First Circuit.

Jan. 29, 1998.

19. The arbitrator is the Honorable Robert L. Steadman, former chief justice of the Massachu-    setts Superior Court.

Richard L. O'Meara, with whom Charles P. Piacentini, Jr. and Murray, Plumb & Murray, Portland, ME, were on brief, for appellants.

Kurt E. Olafsen, with whom Olafsen & Butterfield, Portland, ME, was on brief, for appellees St. Jean, et al.

John G. Connor, with whom Law Office of John G. Connor, Portland, ME, was on brief, for appellee Bruce Goulette.

Before TORRUELLA, Chief Judge, LYNCH, Circuit Judge, and STEARNS,[*] District Judge.

PER CURIAM.

The proper resolution of this appeal depends on three controlling questions of Maine law. Because we find no clear guidance in Maine statutes or case law, we conclude that the best course of action is to certify these questions to the Supreme Judicial Court of Maine. *See* Me. R. Civ. P. 76B; Me.Rev.Stat. Ann. tit. 4, § 57 (West 1997).

### Background

On April 30, 1992, Racal Mortgage, Inc. ("Racal") lent a certain sum to plaintiffs Gregg and Kathleen Bullock, who in exchange executed and delivered to Racal a promissory note and mortgage deed on their residence in Auburn, Maine. Racal entered into similar mortgage loan transactions with plaintiff Bruce Goulette on July 30, 1992, and with plaintiffs Robin and Stephen St. Jean on September 21, 1992.

All three loans were made for the purpose of financing the purchase of the plaintiffs' residences, and were closed in Racal's name, as lender. However, the loans were "table-funded," which means that a third party, Chemical Residential Mortgage Corporation ("Chemical"), provided the funds that Racal lent to the plaintiffs; after the loans were closed, Racal immediately assigned the loans to Chemical. Racal alleges that the borrowers knew that the loans were table-funded.

---

[*] Of the District of Massachusetts, sitting by designation.

In any case, Chemical thereafter serviced the loans and collected any amounts due from the borrowers.

From 1991 to 1994, Racal was registered with the Maine Bureau of Consumer Credit Protection ("BCCP") as a credit services organization ("CSO"), rather than as a supervised lender.[1] The Maine Consumer Credit Code distinguishes between supervised lenders, which are authorized to extend credit to Maine consumers, and CSOs, which simply arrange for the extension of credit to consumers. Me.Rev.Stat. Ann. tit. 9–A, §§ 1–301(39), 10–102(1)(A) (West 1997). Only supervised financial organizations or licensed lenders may engage in the business of making supervised loans. *See* Me.Rev.Stat. Ann. tit. 9–A, § 2–301 (West 1997). "Supervised loans" are consumer loans that either are subject to an interest rate exceeding 12 1/4% per year, or are secured by an interest in real estate. *See* Me.Rev.Stat. Ann. tit. 9–A, § 1–301(40) (West 1997). In contrast, CSOs are only authorized to "(1) [i]mprov[e] a consumer's credit record, history or rating; (2)[a]rrang[e] for or obtain[ ] an extension of credit for a consumer; or (3)[p]rovid[e] advice or assistance to a consumer with respect to subparagraph 1 or 2." Me.Rev.Stat. Ann. tit. 9–A, § 10–102(1)(A) (West 1997).

Maine law penalizes a creditor who violates the regulations pertaining to the making of supervised loans by relieving the debtor from the obligation to pay certain loan charges. However, the specific penalty imposed upon violators has varied. Prior to its amendment in 1994, the Maine Consumer Credit Code provided that if a creditor who was not a supervised lender made a supervised loan, the debtor was not obligated to pay the loan finance charges and was entitled to recover any such charges paid at any point up to 12 months after the last payment due under the loan. Me.Rev.Stat. Ann. tit. 9–A, § 9–405(4) (West Supp.1992).[2] Thus, as a practical matter, the Consumer Credit Code forced a creditor who violated the supervised lending provisions to make an interest-free loan. Nevertheless, the Code also tempered the penalty by providing that a creditor could avoid liability if he or she could establish that "the violation was unintentional or the result of a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such violations or error." Me.Rev.Stat. Ann. tit. 9–A, § 9–405(7) (West Supp.1992).

On March 9, 1994, section 9–405(4) was amended to limit the penalty imposed upon the creditor to recovery of the application fee, prepaid finance charges, closing costs, and the finance charges for the first twelve months of the loan. *See* 1994 Me. Legis. Serv. 496 (West) (entitled "An Act to Promote Equitable Penalties for Unlicensed Consumer Lending"), *codified at* Me.Rev. Stat. Ann. tit. 9–A, § 9–405(4) (1997).[3] However, the 1994 amendment also eliminated the affirmative defense at section 9–405(7)

---

1. In contrast, Racal Mortgage was authorized to solicit and make mortgage loans in New Hampshire. The evidence also indicates that Racal made 35 mortgage loans in its own name in New Hampshire during 1993.

2. Former section 9–405(4) read in full:

   If a creditor has violated the provisions of this article applying to authority to make supervised loans, section 9–201, the debtor is not obligated to pay the loan finance charge. If he has paid any part of the loan finance charge, he has the right to recover the payment from the person violating this article or from an assignee of that person's rights who undertakes direct collection of payments or enforcement of rights arising from the debt. No action pursuant to this subsection may be brought more than one year after the due date of the last scheduled payment of the agreement pursuant to which the charge was paid.

3. Current section 9–405(4) reads in full:

   If a creditor has violated the provisions of this article applying to authority to make supervised loans, section 9–201, the debtor is not obligated to pay any application fee, prepaid finance charge or closing cost, nor the loan finance charge owed for the first 12 months of the loan. If the debtor has paid any part of the application fee, prepaid finance charge, closing cost, or loan finance charge owed for the first 12 months of the loan, the debtor has the right to recover the payment from the person violating this article or from an assignee of that person's rights who undertakes direct collection of payments or enforcement of rights arising from the debt. No action pursuant to this subsection may be brought more than one year after the due date of the last scheduled payment of the agreement pursuant to which the charge was paid.

for violations of section 9–405(4). Thus, the amendment mitigated the severity of the penalty, but made its imposition more likely.[4]

### Proceedings Below

Because Racal was a CSO, rather than a supervised lender, it was barred from making supervised loans. Me.Rev.Stat. Ann. tit. 9–A, §§ 2–301, 10–102(1)(B). The mortgage loans made to the plaintiffs were supervised loans because they were secured by an interest in real estate. Me.Rev.Stat. Ann. tit. 9–A, § 1–301(40). After discovering that Racal was not a supervised lender, the plaintiffs sued for relief under section 9–405(4) in late 1995 in the Maine Superior Court. The plaintiffs filed their suits separately, but Racal later removed the actions to the U.S. District Court for the District of Maine, where they were consolidated for discovery and trial.

Ruling on the parties' motions for summary judgment, the district court first held that there had been no violation of the Consumer Credit Code in the course of the Bullock loan transaction. *St. Jean v. Racal Mortgage*, 952 F.Supp. 22, 26 (D.Me.1997). The district court began by noting that provisions of Article 9 apply only to "creditors." Me.Rev.Stat. Ann. tit. 9–A, § 9–101 (1997). A creditor is defined by the Maine Consumer Credit Code as "a person who both: (A) [r]egularly extends credit in consumer credit transactions; and (B) [i]s the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness...." Me.Rev.Stat. Ann. tit. 9–A, § 1–301(17) (1997). Section 1–301(17) further provides that "[a] person regularly extends consumer credit only if that person extended credit more than 25 times, or more than 5 times for transactions secured by a dwelling in the preceding calendar year." Racal made more than 5 consumer loans during the 1992 calendar year. Nevertheless, the district court interpreted section 1–301(17) to mean that a person's status as a creditor, and thus, the applicability of Article 9's provisions, was not retroactive to the first 5 supervised loans made during a given calendar year. Accordingly, the district court found that Racal was not a "creditor" when it made the Bullock loan because it was the first one made by Racal in Maine during the 1992.[5]

In contrast, the district court held that the St. Jean and Goulette loans were subject to the provisions of Article 9 because by the time that those loans were made, Racal was a "creditor," having already made more than five loans during the calendar year. The district court also rejected various affirmative defenses raised by Racal, including the argument that section 9–405(7) protected it from liability because any violation of the Consumer Credit Code had been unintentional or the result of a bona fide error. The district court found that any error committed by Racal had been an error of law, which the court determined was not a bona fide error for purposes of section 9–405(7). The court concluded by finding Racal liable to the St. Jean and Goulette plaintiffs under section 9–405(4). In doing so, the district court rejected Racal's argument that the plaintiffs' recovery was limited to the penalties set forth in the 1994 amendment to section 9–405(4), and applied, instead, the version of section 9–405(4) that had been in effect in 1992. The district court therefore awarded Mr. Goulette a rebate of $50,903 and relief from future interest payments in the amount of $163,744, and awarded the St. Jeans a rebate of $24,829 and relief from future interest payments in the amount of $55,351.

---

**4.** The only item of legislative history is the testimony of William Lund, Superintendent of the Maine Bureau of Consumer Credit Protection, which he gave on January 25, 1994, before the Committee on Banking and Insurance of the Maine Legislature. Mr. Lund's basic point was that the amendment was necessary in order to "reduce the penalty for unlicensed lending," which in the case of home mortgage loans could reach excessively punitive levels, while still providing "a substantial enough penalty to deter [such] lending." At the same time, the elimination of the affirmative defense for unintentional violations would "avoid the lengthy and expensive hearings that must now be scheduled to determine liability under the Code."

**5.** Because the Bullocks did not appeal, we express no opinion on this aspect of the district court's ruling.

### The Appeal

In its appeal, Racal challenges the district court's entry of summary judgment on three different grounds. First, Racal contends that the district court erred in holding that it had violated the Maine Consumer Credit Code, because the Code does not require a lender's license for the making of table-funded loans. Second, Racal argues that, even if it did violate the Maine Consumer Credit Code, the district court erred in holding that the plaintiffs are entitled to remedies provided by a section of the Code that was repealed before they filed their suits. Third, Racal argues that even if it did violate the Maine Consumer Credit Code, and even if the pre–1994 version of section 9–405 were applicable to this case, the district court erred in entering summary judgment on the statutory defense of unintentional or bona fide error because there were genuine issues of material fact that required a trial for their resolution. The appellees, in turn, contest each of Racal's arguments.

### A.

■ Reviewing de novo the district court's entry of summary judgment, we reject Racal's first argument. Racal is registered in Maine as a CSO rather than as a licensed lender. As noted above, section 2–301 of the Maine Consumer Credit Code provides that "unless a person is a supervised financial organization or has first obtained a license pursuant to this Act ..., he shall not engage in the business of making supervised loans." Supervised loans include "consumer loans that ... are secured by an interest in real estate...." Me.Rev.Stat. Ann. tit. 9–A, § 1–301(40). The loans made to the plaintiffs were supervised loans because they were consumer loans secured by mortgages upon the plaintiffs' residences. A common-sense reading of the statutory language therefore indicates that by making supervised loans to the plaintiffs, Racal violated section 2–301.

Racal does not deny that the table-funded loans were supervised loans, nor that as a CSO it was not entitled to make supervised loans. Instead, Racal argues that it did not "make" the loans, but rather merely "arrang[ed] for the extension of credit" from Chemical to the plaintiffs. CSOs, as discussed above, are authorized to arrange for the extension of credit to be issued by another entity. Me.Rev.Stat. Ann. tit. 9–A, § 10–102(1)(A)(2).

From a policy standpoint, Racal's argument is not unreasonable. Indeed, according to Racal, several other states permit mortgage brokers to make table-funded loans. But the question before us is one of statutory construction, not of policy. The fundamental problem is that Racal chose to structure the transactions so that its name, rather than Chemical's, appeared as the creditor of the indebtedness evidenced by the promissory notes. The Consumer Credit Code defines "creditor" in part as "the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness." Me.Rev.Stat. Ann. tit. 9–A, § 1–301(17)(B). A "consumer credit transaction" includes a "consumer loan," Me.Rev.Stat. Ann. tit. 9–A, § 1–301(12), and the Code defines "loan" as including "the creation of debt by the lender's payment of or agreement to pay money to the debtor...." Me.Rev.Stat. Ann. tit. 9–A, § 1–301(23)(A)(i). While none of these provisions define the expression "making a loan," we think the only interpretation of the phrase that is consistent with the framework of the Consumer Credit Code is that a loan is "made" by the named creditor, even when the funds are actually provided by a third party. We therefore concur with the district court's determination that under Maine law, Racal was required to obtain a lender's license in order to make the loans at issue in this case.[6]

### B.

However, Racal's second assignation of error is less tractable. In their motion for

---

6. The BCCP has adopted the same interpretation of the Code's requirements. In an official March 16, 1993, notice, the BCCP announced that "[a] company is considered to have 'made' a loan, if its name appears in the loan documents, even when the documents are immediately assigned to another lender. Therefore, a broker in Maine who engages in 'table-funded' loans must be licensed as a lender."

summary judgment, the plaintiffs argued that "under both the Maine general savings statute, Me.Rev.Stat. Ann. tit. 1, § 302 (West 1997), and Maine common law, the 1994 amendment to section 9–405(4) [could] not be applied retroactively to their" claims against Racal. *St. Jean,* 952 F.Supp. at 29. Section 302 provides in pertinent part that "[t]he repeal or amendment of an Act or ordinance does not affect any punishment, penalty or forfeiture incurred before the repeal or amendment takes effect, or any action or proceeding pending at the time of the repeal or amendment, for an offense committed or for recovery of a penalty or forfeiture incurred under the Act or ordinance repealed or amended." The plaintiffs' first argument was thus that the penalties provided by the former version of section 9–405(4) had been "incurred" before the amendment took effect, and therefore that these penalties were applicable to their claims against Racal. In support of their argument, they cited *Town of Ogunquit v. McGarva,* 570 A.2d 320 (Me. 1990), which involved a municipal zoning ordinance that provided "that anyone who violated it was guilty of a misdemeanor, to be fined not more than two hundred dollars ($200) for each day such violation is permitted to exist after notification thereof." *Id.* at 321. In that case, the Supreme Judicial Court of Maine held that "[t]he Ogunquit $200 per day fine provision was clearly a 'penalty ... incurred' by the defendant when he began violating the ordinance." *Id.*

The district court rejected this statutory argument. The court distinguished *Town of Ogunquit* on the basis that unlike the zoning ordinance involved in that case, "the previous version of section 9–405(4) did not establish a penalty which was incurred automatically upon a statutory violation." 952 F.Supp. at 30. The district court further cited *Beneficial Finance Co. v. State of Maine, Bureau of Banks and Banking,* 393 A.2d 171 (Me. 1978), in which the Maine Bureau of Banks and Banking had issued an order finding that a lender had violated the Maine Small Loan Agency Act. The order, however, was issued after the Act had been repealed. In finding that the Bureau had lacked authority to issue the order, the Maine Supreme Judicial Court held that the lender had not "incurred" "a

punishment, penalty or forfeiture ... before the repeal" of the Act. *Id.* at 173. The district court concluded that "no penalty or forfeiture could have been incurred under the prior version of section 9–405(4)," and therefore "that section 302 is inapplicable to this case."

Although the plaintiffs' statutory argument against the retroactive application of amended section 9–405(4) was unsuccessful, the district court agreed with the alternative argument based on Maine common law. In doing so, the district court relied on a line of cases holding that the "law of damages is a matter of substance which is fixed when the cause of action accrues." 952 F.Supp. at 30–31 (citing *Howe v. Natale,* 451 A.2d 1198 (Me.1982); *Batchelder v. Tweedie,* 294 A.2d 443 (Me. 1972)). Because the cause of action under section 9–405(4) appeared to accrue at the moment a supervised loan is made by an unlicensed lender, the district court concluded that the penalties established by the former version of section 9–405(4), rather than the amended version, were applicable to the suit brought by the plaintiffs against Racal.

■ On appeal, Racal articulates two distinct rationales for reversing the district court's determination. Racal's first argument is that the traditional presumption, that substantive amendments are prospective and only procedural amendments are retroactive, has been modified by the decision in *Sinclair v. Sinclair,* 654 A.2d 438, 439 (Me.1995). The main question before the court in *Sinclair* was whether an amendment to Maine's mortgage law adding a requirement that mortgage creditors provide twenty days's notice to debtors before commencing foreclosure proceedings, Me.Rev.Stat. Ann. tit. 14, § 6111 (West Supp.1993), was applicable to mortgages executed before the statute's effective date. The general rule in Maine is "that procedural or remedial enactments are presumed to apply retroactively, and ... statutes affecting substantive rights are presumed to apply only prospectively." *Id.* at 439 (citing *Riley v. Bath Iron Works Corp.,* 639 A.2d 626 (Me.1994)). But "labels such as retroactive, prospective, substantive, and procedural are subject to manipulation.... Applying a label foretells the result but does

not materially contribute to a principled decision." *Sinclair*, 654 A.2d at 439–440 (citations omitted). The court therefore relied, instead, on an examination of the legislative purpose behind the statute in order to resolve the issue. Reasoning that "[t]he limitation of section 6111 to private residential mortgages suggests that its purpose is to protect homeowners," and that "the Legislature must have recognized that a limitation of the section's application to future mortgages would leave some homeowners unprotected for nearly 30 years," the Supreme Judicial Court concluded "that the Legislature intended [the statute] to apply to mortgages executed prior to the effective date of the statute." *Id.* at 440. Racal reads *Sinclair* as having replaced the traditional analysis of retroactivity with a more amorphous, intent-based analysis.

Second, Racal argues that even if *Sinclair* did not overrule the line of precedent that relied on the traditional procedural/substantive distinction for determining the retroactive effect of a new statute, the district court erred in finding that the penalties provided by section 9–405(4) are "damages" for purposes of the *Howe* doctrine. Racal argues that the term "damages" is limited to compensation for actual losses, rather than penalties intended to deter undesirable conduct. Noting that the section 9–405(4) penalty requires no proof of actual damages, and indeed that the legislative history indicates that the purpose of the penalty is to deter violations of the Code, Racal argues that the imposition of the penalty is not equivalent to an award of damages. Racal then suggests that if the section 9–405(4) penalty does not constitute "damages," then by negative implication it is not substantive for purposes of retroactivity.

On review, we find it difficult to ascertain whether or not the district court erred. The answer to the first question, whether section 302 applies to this case, depends on whether the penalty imposed by section 9–405(4) is a "penalty" for purposes of section 302 that is "incurred" at the moment a lender violates the provisions of the Maine Consumer Credit Code applying to authority to make supervised loans. There are good arguments on both sides. On the one hand, to describe the sanctions imposed by section 9–405(4) as penalties would be consistent with a definition of the term "penalty" once quoted by the Supreme Judicial Court of Maine: " 'The terms "fine" and "penalty" signify a mulct for an omission to comply with some requirement of law; or for a positive infraction of law.' " *Thompson v. Edgar*, 259 A.2d 27, 29 (Me. 1969) (citation omitted). On the other hand, the *Thompson* decision can cut in the opposite direction. In that case, a driver was convicted of operating a motor vehicle while under the influence of alcohol, and punished, *inter alia*, by having his driver's license suspended for two years. The statute imposing the suspension sanction, however, had been amended after his violation but before his conviction to reduce the term of suspension from two years to three months. On appeal, the Supreme Judicial Court held that under section 302, "the license sanction imposed by [the former version of the statute] was not 'saved' from its implied repeal, even though 'incurred before the repeal' took effect," *Thompson*, 259 A.2d at 30, because it was not a "penalty" for purposes of section 302. Therefore, the question "[w]hether [the sanction] was 'incurred' at the time of the wrongful act ... or when liability for the act was imposed, conviction found, or judgment entered," was explicitly left undecided. *Id.*

Admittedly, it is plausible to argue that Racal incurred a penalty under section 9–405(4) when it violated the Code by closing the loans to the plaintiffs. Insofar as the term "incurred" implies that the penalty is fixed and determinable, the facts of this case are more compelling than those in *Town of Ogunquit*. Whereas in *Town of Ogunquit* the amount of the "automatic" fine was an undetermined amount "no greater than $200 a day," the amount of the penalty under former section 9–405(4) was fixed at the moment of the violation as the total interest due under the loan. On the other hand, the existence of an affirmative defense for bona fide errors suggests that the section 9–405(4) penalty is not "incurred" until a judicial order imposing the penalty has issued.

The *Beneficial Finance* case does not dispel our uncertainty, either. On the one

hand, the Supreme Judicial Court held that "violations found to exist under Me.Rev.Stat. Ann. tit. 9, § 3081 were made cognizable in the courts, ... which are not bound by any legal conclusions reached by the Superintendent of Banks and Banking," which might support by implication the argument that a penalty is not incurred until a court concludes that a violation has occurred. 393 A.2d at 173. On the other hand, the opinion does not directly address the section 302 issue. Instead, the Court focused on whether the Superintendent had authority to issue an order regarding events antedating a statutory amendment, when that same amendment had withdrawn his authority to do so. *Id.* at 173–74.

■ In sum, neither close statutory analysis of section 302 nor a review of its interpretive case law is sufficient to conclusively determine whether it applies to this case. Since our sources are insufficient to allow us to predict with certainty which way the Maine Supreme Court would rule on the question whether section 302 applies to this case, we elect to certify this question to the Maine Supreme Court;

> After all, when the meaning of a state law depends on the decision maker's ability to discern the state legislature's intent from an array of mixed signals, considerations of federalism, comity, and practicality suggest that the state's highest tribunal is best positioned to make an informed and authoritative judgment.

*Acadia Ins. Co. v. McNeil,* 116 F.3d 599, 604 (1st Cir.1997).

■ With regard to Maine common law, we also feel that it is prudent to ask the Supreme Judicial Court to confirm our understanding, which is based on two recent Maine decisions, that it has decided to substitute a legislative intent test for the traditional substantive/procedural test of retroactivity. In *Sinclair,* two Justices were in the "majority," two concurred, and two dissented. All three opinions focused on legislative intent as opposed to the traditional substantive/procedural common law test to determine whether a statute had retroactive effect. Although noting that it was sometimes applied, the majority described the substan-

tive/procedural distinction as unenlightening and subject to manipulation. *Id.* at 439–40. *Sinclair* threw the substantive/procedural common law test into doubt and was followed by *Liberty Mut. Ins. Co. v. Superintendent of Ins.,* 689 A.2d 600, 602 (Me.1997), in which the Supreme Judicial Court said: "[i]n determining the legal consequences of new legislation, *we must look to the events the Legislature intended to be significant.*" (emphasis added). This language strongly suggests that the substantive/procedural test will no longer be applied by the Supreme Judicial Court.

Because we are not entirely free of doubt on the matter, however, we will also certify the common law question to the Maine Court. We ask, however, that prior to its consideration of Maine common law, the Supreme Judicial Court address the underlying question of whether section 302 applies to this case. If that section does apply, it would preempt an analysis of Maine common law.

### C.

■ Racal's third argument on appeal presents another difficult question of Maine law. In its motion for summary judgment, Racal argued that if the 1994 amendment to the Consumer Credit Code did not apply to this case, then the affirmative defense provided by section 9–405(7) relieved it of any liability to the plaintiffs. In particular, Racal contended that section 9–405(7) should be interpreted so that liability may be imposed on an alleged violator of the Code only when the violator has acted deliberately, knowing that its acts violate the Code. Racal claimed that it was protected from liability because it had had no reason to know that making table-funded loans would subject it to the licensing requirements of the Code, particularly given that other states allow mortgage brokers to participate in table-funded loans.

The district court not only rejected this argument, but granted summary judgment in favor of the plaintiffs on this issue, holding that the affirmative defense provided by section 9–405(7) is unavailable where the good-faith mistake was a mistake of law. In the district court's view, the statute's emphasis

was on whether the defendant had the intent to commit the violation itself, rather than the error. Finding that "intent in this case, where the issue is proper licensure, is irrelevant," the district court concluded that "[a] misunderstanding of the law is not excusable under the Code."

Our review of the district court's interpretation of section 9–405(7) is hampered by the absence of interpretive case law from Maine. This did not deter the district court from deciding the question because it found sufficient guidance in the text of the statute. But where it found clarity, we find ambiguity. In our view, the text may be read as the district court did, but it may also be read to permit a company to avoid liability by showing that it believed in good-faith that it had met the Code's requirements. The district court therefore should have canvassed other sources before reaching a final determination.

Furthermore, such other sources as we have found suggest that errors of law might qualify as bona fide errors. In the only reported case we have found to have dealt with a similar question, *see Rea v. Wichita Mortgage Corp.*, 747 F.2d 567 (10th Cir.1984) (interpreting section 5–202(7) of the Oklahoma CCC, which contains language almost identical to the wording of section 9–405(7) of the Maine CCC), the Tenth Circuit held that a good-faith error in legal judgment could be considered a "bona fide error" for purposes of the Uniform Consumer Credit Code. *Id.* at 576.

Similarly, another CSO that had been involved in making table-funded loans in Maine was found not to be liable by the BCCP. *See Bureau of Consumer Credit Protection v. New England Mortgage Brokers, Inc.*, Docket No. CCP–93–106. In March 1993, the BCCP identified a number of CSOs, including New England Mortgage Brokers ("NEMB"), that were closing table funded loans in their own names. This discovery prompted the BCCP to issue the March 16, 1993, notice stating that CSOs were not authorized to make such loans. *See* n. 6, *supra.*

The BCCP subsequently held an administrative hearing to investigate whether NEMB had violated the Code. After the hearing, the BCCP issued a written order finding that NEMB had violated the Code by closing table-funded loans in its own name, but excusing it from liability under the unintentional or bona fide error defense for any such loans made prior to March 1993.

The BCCP found that NEMB's voluntary registration as a CSO indicated that it had made a good-faith attempt to comply with Maine law. The BCCP also acknowledged that "[t]he role and authority of a loan broker or CSO varies from state to state, and in certain jurisdictions, a company may not need to obtain a license as a full-service lender if its mortgage loans are 'table-funded.'" The BCCP therefore concluded that NEMB's "owners reasonably believed they were in compliance with Maine's laws."

However, we cannot predict with reasonable certainty whether the Maine Supreme Court would adopt the Tenth Circuit's holding in *Rea* or the BCCP's decision in *New England Mortgage Brokers*. We are not sufficiently confident that the Maine Supreme Court would choose to follow a single decision, issued by a federal court of appeals from a different circuit, interpreting a similar but not identical statute. Admittedly, the Maine BCCP's decision in the *New England Mortgage Brokers* case, as an interpretation of the Consumer Credit Code by the state regulatory agency entrusted with enforcing the Code, is entitled to some deference. Nevertheless, the decision was an exercise of the BCCP's adjudicatory rather than rulemaking authority, and it is not clear whether the agency would reach the same result were it presented with the case at hand.

In sum, because these two sources are insufficient to allow us to predict with sufficient certainty which way the Maine Supreme Court would rule on the question whether the section 9–405(7) defense includes errors of law, we elect to certify this question to the Maine Supreme Court.[7]

---

**7.** The Maine Supreme Court's decision on this issue would not be moot, because if it is determined that an error of law can constitute a

"bona fide error" for purposes of section 9–405(7), then the evidence that Racal has presented may suffice to create a genuine issue of fact as

### The Questions

■ Our doubts as to the retroactive effect of the 1994 amendment to section 9-405(4) and the scope of the bona fide error defense compels us to seek the guidance of the Maine Supreme Judicial Court. "Absent controlling state court precedent, a federal court ... may certify a state law issue to the state's highest court, or undertake its prediction 'when the course [the] state courts would take is reasonably clear.'" *VanHaaren v. State Farm Mut. Auto. Ins. Co.*, 989 F.2d 1, 3 (1st Cir.1993) (citing *Porter v. Nutter*, 913 F.2d 37, 41 n. 4 (1st Cir.1990)). *See also R.W. Int'l Corp. v. Welch Foods, Inc.*, 88 F.3d 49, 52–53 (1st Cir.1996) (citing *VanHaaren*, 989 F.2d at 3); *Lareau v. Page*, 39 F.3d 384, 390 (1st Cir.1994) (same); *Lyons v. Nat'l Car Rental Sys., Inc.*, 30 F.3d 240, 245 (1st Cir.1994) (same). We therefore certify to the Supreme Judicial Court of Maine the following questions:

I. For purposes of Me.Rev.Stat. Ann. tit. 1, § 302, does a violation of Maine Consumer Credit Code section 9-405(4) constitute a "penalty" incurred at the moment the violation occurred?

II. If the answer to Question I is no, do the 1994 amendments to the Maine Consumer Credit Code have retroactive effect under the common law of Maine?

III. If the answer to Question I is yes, or the answer to Question II is no, can an error of law constitute a "bona fide error" for purposes of Maine Consumer Credit Code section 9-405(7)?

Of course, we would welcome any further guidance that the Supreme Judicial Court could provide on the law of Maine as to the retroactivity of statutory amendments in general, or "on any other relevant aspect of [Maine] law which that court believes should be clarified in order to give context to its response or to permit the proper resolution of the state-law issue[s] confronting us." *Acadia Ins. Co.*, 116 F.3d at 605.

to whether its violation of Maine's licensing requirements was unintentional or otherwise the result of a bona fide error. For example, there is evidence that Racal has consistently cooperated with the BCCP from the beginning, including desisting from making new table-funded loans as soon as it was notified that the BCCP had determined that CSOs lacked authority to make such loans.

At the same time, we do not mean to imply that it is certain that Racal would satisfy the requirements of the bona fide error defense. In particular, there is no evidence that Racal sought legal advice as to the requirements established by Maine law for making home mortgage loans. Admittedly, the fact that the defendants in the *New England Mortgage Brokers* case had also not sought legal advice did not prevent the BCCP from ruling in their favor on the issue of the section 9-405(7) affirmative defense. Nevertheless, it would not be unreasonable for the Maine Supreme Judicial Court to interpret section 9-405(7) as requiring evidence that the lender made some affirmative efforts to avoid violating the Consumer Credit Code, such as by seeking legal advice.