1997 ME 22

**LIBERTY MUTUAL INSURANCE COMPANY et al.**

v.

**SUPERINTENDENT OF INSURANCE.**

Supreme Judicial Court of Maine.

Argued Jan. 7, 1997.

Decided Feb. 5, 1997.

Kevin M. Gillis (orally), Troubh, Heisler & Piampiano, P.A., Portland, for defendant.

Andrew Ketterer, Attorney General, Judith Shaw Chamberlain, Asst. Atty. General

(orally), Augusta, for Superintendent of Insurance.

John H. Rich, III, Perkins, Thompson, Hinckley & Keddy, Portland, for Maine Insurance Guaranty Association.

Before WATHEN, C.J., and GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

RUDMAN, Justice.

[¶ 1] Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company and Liberty Insurance Corporation (Liberty Mutual) appeal from the judgment entered in the Superior Court (Kennebec County, *Atwood, J.*) affirming the decision of the Bureau of Insurance ordering Liberty Mutual to pay an assessment made pursuant to the Maine Insurance Guaranty Association Act ("the Act"), 24–A M.R.S.A. §§ 4431–4452, as amended by P.L. 1989, ch. 67. Liberty Mutual contends that the Bureau of Insurance applied the 1989 amendments to the Act retroactively and that the application of the 1989 amendments to Liberty Mutual is unconstitutional. We conclude that the 1989 amendments were not applied retroactively to Liberty Mutual and affirm the judgment.

[¶ 2] The purpose of the Maine Insurance Guaranty Association Act, *inter alia,* is to provide a mechanism for the payment of covered claims pursuant to certain insurance policies, to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, and to provide an association to assess the cost of such protection among insurers. 24–A M.R.S.A. § 4432 (1990). The Act also created the Maine Insurance Guaranty Association (MIGA) to effectuate the purposes of the Act. *Id.* at §§ 4436, 4438.

[¶ 3] Liberty Mutual wrote workers' compensation insurance in Maine at all relevant times and until 1987. In November and December 1987 Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company and Liberty Insurance Corporation, with Bureau of Insurance (Bureau) approval, each voluntarily terminated their licensed authority to write workers' compensation insurance in Maine.

[¶ 4] In 1989 the Act was amended to, *inter alia,* specify the extent to which a withdrawn insurer remains a "member insurer."[1] 24–A M.R.S.A. § 4435(6). The 1989 amendments also modified the methodology used in making the assessments of each member insurer.[2] 24–A M.R.S.A. § 4440(1).

[¶ 5] From 1989 through 1993 MIGA continued to assess Liberty Mutual for claims arising from insurers that became insolvent prior to Liberty Mutual's withdrawal in 1987. Each assessment was based on the insurer's net direct written premiums for the year preceding the assessment year (1988 through 1992). Liberty Mutual paid these assessments.

[¶ 6] In September 1994 MIGA made an additional assessment for 1991 after discovering that two Liberty Mutual companies had no premiums in 1990 and consequently were not assessed in 1991. The additional assessment was calculated, pursuant to the 1989 amendments to § 4440(1) of the Act, by averaging the companies' premiums during the five years preceding Liberty Mutual's withdrawal from the workers' compensation in-

---

1. The definition of a "member insurer" was amended as follows (1989 language underlined):
    "Member insurer" means any authorized insurer which writes any kind of insurance to which this subchapter applies. If an insurer is authorized at the time of an insolvency and subsequently is approved to withdraw its license authority for the kinds of insurance covered by any account to which claims relating to the insolvency are allocated, the withdrawn insurer shall continue to be a member of each account solely for purposes of assessments relating to claims resulting from the insolvency until these claims are paid or otherwise extinguished.
    24–A M.R.S.A. § 4435(6).

2. The method of calculating assessments was amended as follows (1989 language underlined):

    The assessments of each member insurer provided for under section 4438 shall be in the proportion that the net direct written premiums of the member insurer for the calendar year preceding the assessment on the kinds of insurance in the account bears to the net direct written premiums of all member insurers for the same calendar year on the kinds of insurance in the account, except that assessments to cover a shortfall in any account shall be determined in accordance with section 4440–A. In the case of a withdrawn insurer, the average of its net direct written premium for the 5 calendar years prior to withdrawal shall be used as its assessment base for any year following withdrawal in which the insurer has no net direct written premium.
    24–A M.R.S.A. § 4440(1).

surance market. The total 1991 assessment, as corrected, was $89,064.

[¶ 7] Liberty Mutual initially refused to pay the additional assessment for 1991. Subsequently, MIGA filed a petition with the Bureau of Insurance to suspend or revoke Liberty Mutual's license to transact property or casualty insurance in Maine and to award eight percent interest on the unpaid assessment. After a hearing on MIGA's petition, the Bureau found that the 1989 amendments are prospective legislation and that Liberty Mutual's constitutional rights were not violated when the 1989 amendments were applied to it. Accordingly, the Bureau ordered Liberty Mutual to pay to MIGA the assessed amount of $89,064 plus interest. Liberty Mutual appealed to the Superior Court pursuant to M.R.Civ.P. 80C. The Superior Court affirmed the Bureau's decision in all respects and Liberty Mutual appealed.

[¶ 8] "On an appeal from the Superior Court's review of an administrative decision, we review the agency's decision directly for an abuse of discretion, errors of law, or findings unsupported by the evidence. The construction of a statutory scheme is a question of law for the court." *American Republic Ins. Co. v. Superintendent of Ins.,* 647 A.2d 1195, 1197 (Me.1994), *cert. denied* ── U.S. ──, 115 S.Ct. 1399, 131 L.Ed.2d 287 (1995) (citation omitted).

[¶ 9] Liberty Mutual argues that application of the Act's 1989 amendments to it would retroactively change the consequences of its 1987 decision to withdraw as a workers' compensation carrier by providing that it would now be subject to assessments under the Act. Legislation is considered retroactive if its application determines the legal significance of acts or events that occurred prior to the statute's effective date. *Terry v. St. Regis Paper Co.,* 459 A.2d 1106, 1108 (Me.1983); *Coates v. Maine Employment Sec. Comm'n,* 406 A.2d 94, 96 (Me.1979). Nevertheless, "the application of a statute 'remains prospective if it governs *operative events* that occurred *after* its effective date, even though the entire state of affairs includes events predating the statute's enactment.'" *Barnes v. Commissioner of the Dep't of Human Serv.,* 567 A.2d 1339, 1341

(Me.1989) (quoting *Norton v. C.P. Blouin, Inc.,* 511 A.2d 1056, 1060 n. 5 (Me.1986)). In determining the legal consequences of new legislation, we must look to the events the Legislature intended to be significant. *Barnes,* 567 A.2d at 1341. Liberty Mutual contends that the "operative event" in the instant case was its 1987 conduct of withdrawing from the workers' compensation market and that the act of withdrawing from the market also terminated its liability to MIGA in any year that it did not collect premiums. We disagree.

[¶ 10] Pursuant to the 1987 statutory definition of "member insurer," Liberty Mutual ceased to be a member of MIGA when it withdrew from the Maine workers' compensation market. Nevertheless, MIGA's plan of operation provided that a withdrawn insurance carrier would remain liable for any assessments based on insolvencies that occurred prior to the termination of its license.

[¶ 11] As enacted in 1969, the Act mandated MIGA to "submit to the superintendent a plan of operation ... necessary or suitable to assure the fair, reasonable and equitable administration of the association." 24–A M.R.S.A. § 4439(1)(A) (1969). In 1970 MIGA submitted its plan of operation which was approved by the superintendent and became effective later that year. MIGA's plan of operation provides that an insurer admitted to transact insurance covered by the Act automatically becomes a "member" of MIGA. When an insurer ceases to be admitted, it automatically ceases to be a member of MIGA, "[p]rovided that such insurer shall remain liable for any assessments based on insolvencies that occurred prior to the termination of its license." Maine Insurance Guaranty Association, Plan of Operation, Art. 5(A) (1970). The Act and any future amendments to the Act were also incorporated by reference into MIGA's plan of operation. *Id.* at Art. 7. All member insurers are required to comply with the plan of operation. 24–A M.R.S.A. § 4439(2).

[¶ 12] The Legislature granted broad authority to MIGA to develop a plan of operation to effectuate the Act. The plan developed by MIGA was approved by the

Superintendent and became binding on all member insurers. Liberty Mutual, as a member insurer prior to 1987, was required to comply with the plan of operation as a condition of its license to sell workers' compensation insurance in Maine. Pursuant to that plan, even after Liberty Mutual ceased to be a "member insurer," it remained liable for insolvencies that occurred prior to its withdrawal.[3] Consequently, Liberty Mutual's 1987 act of withdrawing from the Maine workers' compensation market did not change its legal status under the Act, *i.e.* it did not affect the *existence* of its ongoing liability to MIGA for insolvencies that occurred while it remained a member insurer.

 [¶ 13] Looking to the event the Legislature intended to be significant in the 1989 amendments of the Act, it is clear that the "operative event" was the need to make an assessment as the result of an insolvency.[4] *See Metropolitan Property & Casualty Ins. Co. v. Rhode Island Insurer's Insolvency Fund,* 811 F.Supp. 54, 58 (D.R.I.1993) (cross-assessment amendments to insurer's insolvency fund statute "triggered" by need to pay claims in given year rather than previous insolvencies that spawned claims; no retroactive application of statute). The 1989 amendment to 24–A M.R.S.A. § 4440(1) changed the method of calculating an assessment for which Liberty Mutual was already liable. Had no claims from pre–1987 insolvencies arisen, the 1989 amendments to section 4440(1) would never have applied to Liberty Mutual. The additional assessments at issue in this case occurred in 1991. Here, the "operative event" took place after the effective date of the 1989 amendments and the amendments were applied prospectively to determine the proper assessment to be apportioned to Liberty Mutual. Accordingly, the Bureau did not err when it determined

that the amendments were not applied retroactively to Liberty Mutual in this case.

[¶ 14] Since the 1989 amendments have not been applied retroactively to Liberty Mutual, we need not address the constitutional issues raised. *Halfway House, Inc. v. City of Portland,* 670 A.2d 1377, 1380 (Me.1996).

The entry is:

Judgment affirmed.

---

3. In fact, when Liberty Mutual later withdrew in 1987, it continued to pay assessments based on pre–1987 insolvencies up to and including a 1993 assessment.

4. The preamble to L.D. 750 (114th Legis.1989) states that the emergency legislation is needed because the *funding mechanism* needs to be modified immediately to ensure that the funds will have sufficient assets to cover claims of individuals insured by companies that have recently

become insolvent. The statement of fact accompanying the amendments states that the bill attempts to provide a funding mechanism which will accommodate expected claims against MIGA and MLHGA. Although the statement of fact also addresses withdrawn insurers, it does so in the context of explaining the assessment process. The clear focus of the legislation is a need to revise the method of calculating assessments.