#29895-r-JMK
**2023 S.D. 31**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

SOUTH DAKOTA LIFE & HEALTH
GUARANTY ASSOCIATION,                          Appellee,

v.

SOUTH DAKOTA BANKERS
BENEFIT PLAN TRUST,                            Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE M. BRIDGET MAYER
Judge

\* \* \* \*

MICHAEL L. SNYDER
CHARLES D. GULLICKSON
MITCHELL A. PETERSON of
Davenport, Evans, Hurwitz
    & Smith, LLP
Sioux Falls, South Dakota                      Attorneys for appellee.


TERRA M. LARSON
MICHAEL F. SHAW of
May, Adam, Gerdes & Thompson, LLP
Pierre, South Dakota                           Attorneys for appellant.

\* \* \* \*

ARGUED
AUGUST 31, 2022
OPINION FILED **07/05/23**

#29895

KERN, Justice

[¶1.]		Until 2019, the South Dakota Bankers Benefit Plan Trust (Trust) was statutorily required to be a member of the South Dakota Life and Health Guaranty Association (Association). The Association covers impaired and insolvent insurers' obligations to their insureds by assessing Association members. In 2017, the Association assumed liability for an insolvent insurer. The Association established a five-year assessment schedule to cover the insolvent insurer's obligations. The Trust paid three years but protested having to pay the last two because they were assessed after its membership in the Association ended. The Association denied the Trust's protests.

[¶2.]		The Trust appealed to the South Dakota Division of Insurance, which scheduled a hearing in front of the Office of Hearing Examiners (Examiner). The Examiner determined that the Association had no legal authority to assess the Trust for the last two assessments because they were authorized and called after the Trust ended its membership in the Association, and the Employee Retirement Income Security Act of 1974 (ERISA) preempted the State's laws requiring trusts to make payments for assessments.

[¶3.]		The Association appealed the Examiner's decision to the circuit court, arguing that the Association had legal authority to assess the Trust under State law and its plan of operation, and ERISA does not preempt any state insurance law making the Trust liable for the assessments. The circuit court reversed the Examiner's order and adopted the Association's arguments. The Trust now appeals

from the circuit court's order requiring the Trust to pay the two assessments along with prejudgment interest. We reverse.

## Facts and Procedural History

[¶4.]    Both parties have stipulated to the material facts underlying this appeal as first recounted in the Examiner's findings of fact. The Association is an organization that exists to pay benefits and continue coverages of impaired and insolvent insurers through assessments that it levies upon its member insurers, subject to limitations delineated in SDCL chapter 58-29C. South Dakota Bankers Benefit Plan Trust is a Multiple Employer Welfare Arrangement (MEWA) under ERISA § 3(40). The Trust is also a self-funded Multiple Employer Trust (MET) pursuant to SDCL 58-18-88. The Trust provides and maintains an employee welfare benefit plan for eligible employees of employers that are active members of the South Dakota Bankers Association. It describes its purpose as "assum[ing] the financial risk of providing health care benefits to its members by maintaining stop-loss coverage and adequate reserves to cover any potential losses, as well as making participating employers assessable in the event of insolvency."

[¶5.]    Before July 1, 2019, the Trust was required under SDCL 58-18-88(6) to participate in and be a member of the Association. However, on July 1, 2019, a legislative amendment to SDCL 58-18-88 took effect and eliminated the Trust's mandatory membership in the Association. Consequently, the Trust ended its membership.

[¶6.]    At issue in this appeal is whether the Trust is obligated to pay assessments issued by the Association after the Trust ceased being a member. The

assessments arose from the insolvency of the insurers Penn Treaty Network American Company and its subsidiary American Network Insurance Company (collectively Penn Treaty). Penn Treaty was declared insolvent pursuant to an order of liquidation entered by the Commonwealth Court of Pennsylvania on March 1, 2017, approximately two years before the Trust ended its membership with the Association. That same day, the Association accepted liability for and reinsured the obligations it incurred as a result of Penn Treaty's liquidation. The Association decided to spread the obligatory payments, resulting from the liquidation, over five years rather than requiring its members to pay a one-time lump-sum payment.[1] Had it wished to, the Association asserts that it could have legally assessed a one-time lump-sum payment in 2017 pursuant to SDCL 58-29C-51(O) and SDCL 58-29C-52(A).[2]

---

1. The Association authorized yearly assessments for its total obligation. The first of five yearly assessments was authorized in a resolution passed unanimously by the Association's Board of Directors on April 5, 2017. In part, this resolution stated:

   > The Board hereby authorizes and approves a Class B assessment of its member insurers having health premiums in South Dakota for the time periods specified herein in the amount of $8,800,000 less the amount of PTNA and ANIC assets allocable to the Association as reasonably determined by the guaranty associations' Penn Treaty Task Force, its consulting actuaries, LTC Re, and the Executive Director of the Association. The Board notes that the current estimated amount of estate assets allocable to the Association is $3,176,000 and may be subject to change.

2. During oral arguments, the Trust expressed doubt over whether the Association could have assessed a one-time lump-sum payment for the entire obligation amount. The Trust directed this Court to SDCL 58-29C-52(E)(1)(a), which provides that "the total of all assessments . . . may not in

(continued . . .)

[¶7.]        To satisfy its obligations over the five years, as planned, the

Association began authorizing yearly assessments to be paid by its members.[3]  The

Association authorized and called assessments in 2017, 2018, and 2019.  The Trust

paid all three without objection.[4]  However, after the Trust ended its membership in

the Association, it protested having to pay the Association's 2020 assessment, which

was authorized on December 20, 2019, and called on January 22, 2020.  On January

28, 2020, in response to the called assessment, the Trust sent the Association a

letter outlining its objection to paying the assessment.  The Association responded

in a letter dated February 7, 2020, stating its understanding that the Trust was still

_____

(. . . continued)
          one calendar year exceed two percent of that member insurer's average
          annual premiums[.]"  Although the Trust's average premiums are not in the
          record, the Trust asserted that a one-time lump-sum payment would have
          exceeded the statutory limit by $105,000.

3.        Each yearly assessment levied by the Association must go through the
          statutory process of being "authorized" and "called" by the Association before
          member insurers must pay the assessment.  SDCL 58-29C-48(3) defines an
          assessment as "authorized" when "a resolution by the board of directors has
          been passed whereby an assessment will be called immediately or in the
          future from member insurers for a *specified amount.*  An assessment is
          authorized when the resolution is passed[.]"  (Emphasis added.)  Member
          insurers do not have to pay an authorized assessment until it is "called,"
          which occurs when "a notice has been issued by the association to member
          insurers requiring that an authorized assessment be paid within the time
          frame set forth within the notice.  An authorized assessment becomes a called
          assessment when notice is mailed by the association to member insurers[.]"
          SDCL 58-29C-48(5).

4.        The actions of the Board are recorded in its April 5, 2017 minutes wherein
          the Board authorized the specific 2017 assessment.  In the Board's January 9,
          2018 minutes, the Board authorized the 2018 assessment.  In the Board's
          December 17, 2018 minutes, the Board authorized the 2019 assessment.  The
          letters calling the 2017, 2018, and 2019 assessments do not appear in the
          record.

required to pay the assessment. The Trust then paid the assessment under protest as reflected in its correspondence to the Association dated February 21, 2020.

[¶8.] The Association denied the Trust's protest in a letter dated April 9, 2020, and advised the South Dakota Division of Insurance of the denial the same day. The Trust appealed the denial to the Division of Insurance on June 2, 2020. The Division of Insurance scheduled the appeal for a hearing before the Office of Hearing Examiners.

[¶9.] Before the Examiner made its decision, the Association authorized and called the 2021 assessment, which the Trust similarly paid under protest, and the Association again denied. At the Trust's request, its two protests were consolidated for purposes of the appeal before the Examiner.

[¶10.] On March 23, 2021, the Examiner issued its decision, concluding that the Trust "was under no obligation to pay the assessments to [the] Association in 2020 and 2021 as the assessments were made after [the] Trust no longer belonged to [the] Association." Furthermore, the Examiner determined that the Trust was prohibited by federal law, specifically, ERISA, from making payments to the Association and that any South Dakota law purporting to require the Trust to make such payments was preempted by ERISA. Accordingly, the Examiner ordered the Association to refund the Trust's 2020 and 2021 assessment payments, along with prejudgment interest, which the Association did on April 7, 2021.

[¶11.] The Association appealed the Examiner's decision and final order to the circuit court, raising several issues. First, the Association claimed the Trust was required to pay the 2020 and 2021 assessments under state law in conjunction

with the Association's plan of operation. Second, the Association asserted that the Examiner erred in concluding that ERISA preempted any South Dakota statute requiring the Trust to pay the assessments. Third, the Association argued that the Examiner retroactively applied substantive law by determining that the amendments to SDCL 58-18-88(6), ending the requirement that the Trust participate as a member of the Association, terminated the Trust's obligation to pay the assessments.[5] Finally, the Association argued that it was improper for the Examiner to require the Association to reimburse the Trust for prejudgment interest on the assessments paid under protest.

[¶12.] After briefing by both parties, the circuit court issued a written memorandum opinion in which it concluded that "the [Examiner] impermissibly gave Senate Bill 37 [the statutory amendments ending the Trust's obligatory membership in the Association] retroactive effect and therefore its decision must be reversed." The circuit court further determined that "[t]he two assessments paid under protest must remain paid, and interest thereon is further ordered." The court agreed with the Association that the Trust acquired the obligation to pay for all five yearly assessments in 2017 when Penn Treaty was liquidated. The court held that by not requiring the Trust to pay the 2020 and 2021 assessments, the 2019 amendment, which abrogated the Trust's required membership in the Association, was given substantive retroactive effect. Further, the circuit court reasoned that the Association's plan of operation authorized the Association's assessments against

---

5. This question relies on the premise, and the Association's assertion, that the Trust became wholly liable for the assessments in 2017 when the Association acquired Penn Treaty's insurance obligations.

the Trust after it ended its membership in the Association. Finally, the court held that the Examiner erred in concluding ERISA preempted any South Dakota statute requiring the Trust to pay the Association's assessments.

[¶13.] The circuit court incorporated its memorandum opinion into its order and final judgment, which ordered the Trust to pay the Association prejudgment interest on the returned 2020 and 2021 assessment amounts. The prejudgment interest was to be calculated "at the rate of 10% per annum per SDCL 21-1-13.1 and SDCL 54-3-16, with said interest beginning to accrue as of April 7, 2021[,]" which is the date the Association returned the 2020 and 2021 assessment payments to the Trust pursuant to the Examiner's order.

[¶14.] The Trust appeals, raising several issues which we consolidate and restate as follows:

1. Whether the Association possessed a legal basis to assess the Trust in 2020 and 2021 for any Penn Treaty liquidation obligations following the Trust's statutory release from membership on July 1, 2019.

2. Whether ERISA's exclusive benefit rule precluded the Trust from paying the 2020 and 2021 assessments.

3. Whether the circuit court erred by ordering the Trust to pay prejudgment interest.

**Standard of Review**

[¶15.] When this Court reviews a decision originating from an administrative agency, and "[w]hen the issue is a question of law, the decisions of the administrative agency and the circuit court are fully reviewable." *Pirmantgen v. Roberts Cnty.*, 2021 S.D. 5, ¶ 20, 954 N.W.2d 718, 724 (quoting *Butte Cnty. v. Vallery*, 1999 S.D. 142, ¶ 8, 602 N.W.2d 284, 287). Moreover, both parties

submitted this case on stipulated material facts; thus, "we review the entire matter de novo without deference to the findings of the circuit court or the [Office of Hearing Examiners]." *Wendell v. S.D. Dep't of Transp.*, 1998 S.D. 130, ¶ 5, 587 N.W.2d 595, 597 (citing *Muhlenkort v. Union Cnty. Land Tr.*, 530 N.W.2d 658, 660 (S.D. 1995)).

## Analysis and Decision

***Whether the Association possessed a legal basis to assess the Trust in 2020 and 2021 for any Penn Treaty liquidation obligations following the Trust's statutory release from membership on July 1, 2019.***

[¶16.] The Trust argues that only the Association, and not the members of the Association, incurred liability for Penn Treaty's insolvency when Penn Treaty was liquidated in 2017. The Trust, therefore, contends that the Association's members did not become liable for the assessment amounts until the Association authorized and called each individual assessment for payment by the members. For this reason, the Trust agrees that it was liable for the 2017, 2018, and 2019 assessments because they were authorized and called while the Trust was a member of the Association, but because the 2020 and 2021 assessments were authorized and called after the Trust had ceased to be a member of the Association, the Trust asserts that it cannot be held liable for them.

[¶17.] The Association responds that its individual members became liable for funding obligations arising from the Penn Treaty liquidation at the same time the Association did—in 2017 when Penn Treaty was liquidated. Further, the Association contends that the Trust was a "member insurer" under SDCL 58-29C-48(12) when Penn Treaty was liquidated and that, according to the Association's

plan of operation (which it argues is controlling), as a member insurer the Trust remained liable for assessments arising from the Penn Treaty Liquidation. For support, it directs this Court to language in its plan of operation that states, a member insurer "shall remain liable for any assessments based on *impairments* occurring prior to the termination of its license."[6] (Emphasis added.) The Association acknowledges that Penn Treaty was declared insolvent—not impaired—in 2017; however, they argue that the "distinction between impairments and insolvencies . . . is immaterial" because Penn Treaty was impaired before it was insolvent.

[¶18.] The Trust does not dispute that the Association's plan of operation is controlling. Rather, it asserts that a material distinction exists between impairments and insolvencies. The Trust contends that the Association's plan of operation ascribes liability to a member insurer for assessments arising only from impairments, not insolvencies.[7] Further, the Trust asserts that it was never a

---

6. "Any insurer which transacts in this state any kind of insurance for which coverage is provided under the Act and which is included in the definition of 'member insurer' in SDCL 58-29C-48(12) shall be a member of the Association." Amended and Restated Plan of Operation Art. VI.A. (2007).

"An insurer which ceases to be admitted shall automatically cease to be a member effective on the day following the termination or expiration of its license to transact the kinds of insurance covered by the Act. However, such insurer shall remain liable for any assessments based on impairments occurring prior to the termination of its license. Such insurer shall also be entitled to a refund of all or part of any assessments which were made prior to termination of its license which later proves to be excessive." Amended and Restated Plan of Operation Art. VI.B. (2007).

7. The Association amended its plan of operation in 2020, after the Trust had ceased its membership, to state in relevant part that "such insurer shall

(continued . . .)

*member insurer* as that term is used in SDCL chapter 58-29C, but only a *member* of

the Association, and therefore the Association's plan of operation cannot obligate

the Trust to pay the 2020 and 2021 assessments.

       a.     *Whether the Trust became liable for the Penn Treaty*
                *Liquidation obligations as a whole in 2017.*

[¶19.]      It is well settled that "[w]ords and phrases in a statute must be given

their plain meaning and effect. When the language of a statute is clear, certain and

unambiguous, there is no reason for construction, and the Court's only function is to

declare the meaning of the statute as clearly expressed." *Goetz v. State*, 2001 S.D.

138, ¶ 16, 636 N.W.2d 675, 681 (internal citations omitted) (quoting *US West v.*

*PUC*, 505 N.W.2d 115, 123 (S.D. 1993)). This Court has "repeatedly stated that . . .

it is the function of the [C]ourt to give [the words] effect and not to amend the

statute to avoid or produce a particular result." *Id.* ¶ 18 (second alteration added)

(citation omitted). Additionally, "words of a statute must be read in their context

and with the view to their place in the overall statutory scheme." *In re Hunt Cos.,*

*Inc.*, 2019 S.D. 26, ¶ 24, 927 N.W.2d 894, 900 (quoting *Expungement of Oliver*, 2012

S.D. 9, ¶ 9, 810 N.W.2d 350, 352).

[¶20.]      Here, the governing statutes did not fix the Trust's liability for the

Penn Treaty liquidation obligations as a whole in 2017, as the Association argues.

Rather, the statutes merely define how and when an assessment may be authorized

---

(. . . continued)
     remain liable for any assessments based on impairments *or insolvencies*
     occurring prior to the termination of its license." (Emphasis added.) Both
     parties agree that the Association's previous plan of operation governs this
     dispute.

and called and direct how assessments are to be allocated amongst its member insurers without any directive on when a member becomes *legally obligated* for the assessment.[8]  *See* SDCL 58-29C-48(3), (5); SDCL 58-29C-52(C).  Notably, the Association does not argue that member insurers are obligated by statute to pay assessments before they are both authorized and called.  The Association instead relies upon the plan of operation to support its claim that the Trust's obligation for the Penn Treaty liquidation became fixed in its entirety in 2017.

[¶21.]       Indeed, it would be difficult, if not impossible, for a member insurer to pay such an obligation, as the amount owed at any given time is unclear until an assessment is authorized and called.  And according to SDCL 58-29C-48(3), an assessment is not "authorized" until a resolution has been passed stating that an assessment will be called immediately or in the future from member insurers for a specified amount.

[¶22.]       For these reasons, we conclude that, although the Association incurred liability for the Penn Treaty liquidation obligations in 2017 when Penn Treaty was liquidated, the Trust only incurred liability under the statutes for the yearly

---

8.    The lack of statutory direction here contrasts with the process described in Chapter 58-29A, governing Insurance Guaranty Associations, which provides explicit instructions on how to determine a member insurer's obligation for assessments occurring when an ex-member insurer no longer has a license to transact the type of insurance covered by the chapter as a result of an insolvency.  Under SDCL 58-29A-55(9), "the insurer shall remain liable as a member insurer for any obligations, including . . . assessments levied after the termination or expiration [of its license], with respect to any insurer that became an insolvent insurer prior to the termination or expiration of the insurer's license[.]"  Notably, Chapter 58-29A excludes the chapter's application to "[l]ife, annuity, health, or disability insurance[.]"  *See* SDCL 58-29A-54.

assessments when the Association authorized and called each assessment for a specific amount. Therefore, because the 2020 and 2021 assessments were authorized and called after the Legislature eliminated the Trust's mandatory membership in the Association, the Trust was not obligated by statute to pay these two assessments.[9]

> b. *Whether the Trust can be held liable under the terms of the Association's plan of operation.*

[¶23.] The Association, however, submits that the Trust can still be liable for the 2020 and 2021 assessments pursuant to the terms of the Association's plan of operation, which the Association describes as functioning as its "bylaws." As previously noted, the Trust makes two arguments regarding liability under the plan of operation: first, it asserts that the plan of operation allows liability only for assessments based on *impairments*, not *insolvencies*, that arose while the Trust was a member of the Association; second, it contends that it was not a "member insurer"

---

9. The circuit court determined that the 2019 amendment to SDCL 58-18-88, eliminating the Trust's mandatory membership in the Association, was a substantive amendment that could not be applied retroactively to relieve the Trust's obligation for the Penn Treaty liquidation that arose in 2017. *See* SDCL 2-14-18 ("The repeal of any statute by the Legislature shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute unless the repealing act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability."). The circuit court's reasoning presupposed that the Trust's entire liability for the Penn Treaty liquidation was set by statute in 2017. However, since the statutes did not expressly create or fix the Trust's liability for the Penn Treaty liquidation until the assessments were authorized and called, the 2019 amendment merely relieved the Trust of any liability for future assessments. The amendment did not act to release or extinguish any existing liability of the Trust under the statute.

or "insurer" as the term is used in the plan of operation, meaning it did not qualify for membership under Art. VI.[10]

[¶24.]    "The principles which govern the construction of contracts also govern the construction and interpretation of [] bylaws." *St. John's Hosp. Med. Staff v. St. John Reg'l Med. Ctr., Inc.*, 90 S.D. 674, 679, 245 N.W.2d 472, 475 (1976) (citation omitted); *see also In re Color Tile Inc.*, 475 F.3d 508, 515 (3rd Cir. 2007) (applying rules of contractual interpretation to bylaws outside the context of a hospital and its staff). "[W]here the terms of a contract are plain and unambiguous, the duty of the [C]ourt is to construe it as it stands, giving effect to the plain meaning of the language used." *St. John's Hosp. Med. Staff*, 90 S.D. at 679, 245 N.W.2d at 475 (citation omitted). "Under the Plain Meaning Rule, if a term 'appears to be plain and unambiguous on its face, its meaning must be determined from the four corners of the instrument[.]'" *Halls v. White*, 2006 S.D. 47, ¶ 7, 715 N.W.2d 577, 580–81 (citation omitted).

[¶25.]    Here, we need not reach the Trust's second argument because we conclude that the Association's plan of operation allows liability only for "assessments based on impairments[,]" not insolvencies. Our conclusion absolves the Trust of liability for the assessments regardless of the Trust's status as a "member insurer" or "insurer." As quoted above, the Association's plan of operation states that an "insurer shall remain liable for any assessments based on impairments occurring prior to the termination of its license." SDCL 58-29C-48(10) defines an "impaired insurer" as "a member insurer which, after July 1, 2003, *is not*

---

10.    *Supra* note 6.

*an insolvent insurer*, and is placed under an order of rehabilitation or conservation by a court of competent jurisdiction[.]" (Emphasis added.) Conversely, SDCL 58-29C-48(11) defines an "insolvent insurer" as "a member insurer which after July 1, 2003, is placed under an order of liquidation by a court of competent jurisdiction with a finding of insolvency[.]"

[¶26.] Based on these definitions, in 2017, when Penn Treaty was declared insolvent by the Pennsylvania court's liquidation order, Penn Treaty ceased to be an *impaired* insurer (Penn Treaty had been under an order of rehabilitation before the liquidation order, and the liquidation order terminated the order of rehabilitation) and became an *insolvent* insurer. And as SDCL 58-29C-48(10) states, an impaired insurer "is not an insolvent insurer[.]" Thus, the Association's 2020 and 2021 Penn Treaty assessments were not "assessments based on impairments occurring prior" to the Trust leaving the Association. They were assessments based on an *insolvency*. The Association did not levy or call an assessment for any Penn Treaty obligations until after Penn Treaty became insolvent. Because the 2020 and 2021 assessments were based on insolvencies, not impairments, under the plain meaning of the Association's plan of operation, the Trust never assumed liability for them. As such, the Trust cannot "remain liable" for something it did not assume.

[¶27.] Yet, the Association points us to *Liberty Mut. Ins. Co. v. Superintendent of Ins.*, 689 A.2d 600 (Me. 1997) and *Miss. Mfrs. Ass'n Workers' Comp. Grp. v. Miss. Workers' Comp. Grp. Self-Insurer Guar. Ass'n*, 281 So. 3d 108 (Miss. Ct. App. 2019) to assert that "guaranty association members cannot evade their obligations to continue paying assessments for preexisting obligations by

-14-

withdrawing, when a guaranty association's plan of operation—like the Association's—contains language expressly stating the opposite." In response, the Trust argues that these two cases are distinguishable and do not mandate the result asserted by the Association under the present facts. We agree.

[¶28.] With respect to *Liberty Mutual*, in 1987 Liberty Mutual voluntarily terminated its "licensed authority to write workers' compensation insurance in Maine[,]" thereby withdrawing from the Maine Insurance Guaranty Association (MIGA). 689 A.2d at 601. The Supreme Judicial Court of Maine concluded that "[p]ursuant to that plan [of operation], even after Liberty Mutual ceased to be a 'member insurer,' it remained liable for insolvencies that occurred prior to its withdrawal." *Id.* at 603. In *Liberty Mutual*, unlike the Association's plan of operation, "MIGA's plan of operation provided that a withdrawn insurance carrier would remain liable for any assessments based on *insolvencies* that occurred prior to the termination of its license*." Id.* at 602 (emphasis added). Because the Association's plan of operation is written differently from MIGA's, and, unlike the Association's, MIGA's plan expressly subjected a former member insurer to liability for insolvencies occurring before the insurer's withdrawal, the Association's reliance on *Liberty Mutual* to support enforcing an obligation on the Trust is unpersuasive.

[¶29.] In *Mississippi Manufacturers*, the Mississippi workers' compensation Group Guaranty Association (GGA) operated to "pay workers' compensation claims on behalf of any group self-insurer that becomes insolvent." 281 So. 3d at 109. The Mississippi Manufacturers Association Workers' Compensation Group (Manufacturers) withdrew from the GGA when it "stopped issuing self-insured

workers' compensation coverage[.]" *Id.* at 110. Under the GGA's plan of operation, "a withdrawing member 'will continue to be liable for assessment for three (3) years or until there are no liabilities outstanding under its previous self-insured pooling status, which[ever] is greater.'" *Id.* at 111. The GGA imposed an assessment, which the Manufacturers challenged, within three years of the Manufacturer's withdrawal from the GGA. *Id.* On appeal, although the Court of Appeals of Mississippi determined that the assessment was invalid on other grounds, it concluded "that GGA had continuing authority to assess the [Manufacturers] for at least three years after it withdrew from the GGA" in accordance with the language of the GGA's plan of operation despite the Manufacturers having "ceased operations as a self-insurer, obtained a third-party insurance policy to cover all of its remaining workers' compensation obligations, and withdr[awn] from the GGA." *Id.* at 110, 114.

[¶30.] Here, unlike MIGA and GGA, the Association does not have clear plan of operation language imposing liability on a former member for insolvencies that occurred prior to the member's withdrawal. Considering the absence of authoritative language in the plan of operation obligating the Trust to pay the challenged assessments, along with our determination that the Trust did not incur liability for the 2020 and 2021 assessments because they were not authorized and called before the Trust ceased to be a member of the Association, we conclude that the Trust is not liable for these assessments.

[¶31.] Having resolved the issues on other grounds, we need not reach the applicability of ERISA's exclusive benefit rule.[11] "As a general rule, this Court will not decide an issue when doing so 'will have no practical legal effect upon an existing controversy.'" *Endres v. Endres*, 2022 S.D. 80, ¶ 54, 984 N.W.2d 139, 156 (quoting *Skjonsberg v. Menard, Inc.*, 2019 S.D. 6, ¶ 14, 922 N.W.2d 784, 788).

### *Whether the circuit court erred by ordering the Trust to pay prejudgment interest.*

[¶32.] Finally, because we reverse the circuit court's determination that the Trust was liable for the 2020 and 2021 assessments, we also reverse the circuit court's award of prejudgment interest, which was ordered on the basis that the Trust was liable for the assessments and wrongfully retained the money.

### Conclusion

[¶33.] We conclude that the Trust was not liable to pay the Association's 2020 and 2021 assessments arising from its obligations for the Penn Treaty liquidation. Under the governing statutes, Association members assume liability for assessments once they are both authorized and called. Because the Trust was not an Association member at the time the assessments were called, it assumed no financial liability. Furthermore, the Association's plan of operation subjects former members to liability for assessments arising only from impaired insurers, not insolvent insurers. Since the disputed assessments arose from the liquidation of an insolvent insurer, the Trust assumed no liability under the Association's plan of operation. Finally, we reverse the circuit court's order on prejudgment interest.

---

11. The Trust did not raise the issue of whether the 2017–2019 assessments would have been prohibited under ERISA.

[¶34.]        JENSEN, Chief Justice, and SALTER, DEVANEY, and MYREN,

Justices, concur.